Filed 12/23/14  P. v. Reed CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ERIC STEFON REED,<br><br>    Defendant and Appellant. | 2d Crim. No. B252211<br>(Super. Ct. No. BA391200)<br>(Los Angeles County) |

Eric Stefon Reed appeals his conviction, by jury, of first degree murder in the shooting death of Felton Glass.  An expert witness testified at trial about the psychological factors that influence eyewitness identifications.  Appellant contends the trial court erred when it failed to instruct the jury, sua sponte, that expert testimony is a form of circumstantial evidence and that the interpretive principles governing the evaluation of circumstantial evidence apply with equal force to the evaluation of an expert witness' testimony.  More specifically, appellant contends the trial court erred because it did not sua sponte instruct the jury that, if the expert testimony supported multiple reasonable inferences, one of which pointed to innocence and the other to guilt, the jury was obligated to accept the inference pointing to innocence.  We affirm.

*Facts*

Appellant and 13-year old Javon Sullivan were both members of the "Western Loc Crips," a Los Angeles street gang.  On November 21, members of the

1

rival "Eight Trey Gangsters," shot at Sullivan as he was walking inside his own gang's territory. Sullivan wanted revenge. The next morning, November 22, Sullivan decided to go into Eight Trey Gangsters' territory to shoot one of them. Sullivan ran into appellant, a fellow gang member, at a liquor store. Sullivan told appellant what he wanted to do. Appellant agreed to go with him and lifted his shirt to show Sullivan the gun he had in the waistband of his pants.

Appellant and Sullivan walked to a bus stop inside the Eight Trey territory, at the northwest corner of Western Avenue and Manchester Avenue, in Los Angeles. From there, they saw the victim, Felton Glass, standing near a bus stop on the opposite side of the street. Sullivan believed Glass was a member of Eight Trey because of the way he walked and because he was inside the Eight Trey territory. Appellant and Sullivan crossed the street. Appellant drew his gun and shot Glass several times. Glass fell to the ground. Sullivan shot Glass after he was down. After firing two shots, Sullivan ran away. One of the two guns used to shoot Glass was found in Sullivan's pocket when he was arrested about ten minutes later. When police officers first encountered Sullivan, he was using his cell phone to call appellant's cell phone. Sullivan called appellant's phone four times in the 10 minutes after the shooting occurred. Both phones were physically located within a few blocks of the shooting when those calls were made.

In the statements he later gave to police, and in his trial testimony, Sullivan refused to identify appellant by name or appearance as his accomplice in the shooting. He referred to his accomplice as "DJ," without using DJ's given name. At the police station, however, Sullivan identified a photograph of appellant as DJ. Sullivan retracted that identification at trial, explaining he had been mad at appellant over a girl so he lied to implicate appellant in a murder.

Appellant's stepfather, Thomas Butler, testified that appellant came home between 9:00 and 10:00 a.m. on the day of the shooting. Although appellant often wore his hair braided, on the day of the shooting it was unbraided and in a long, unruly "afro." Appellant also had a mustache and goatee. He asked Butler to cut his

2

hair, explaining that he couldn't find anyone to braid it. Butler used his clippers to cut appellant's hair short. Appellant then changed his clothes and went to school.

Appellant and Sullivan shot Glass at 7:55 a.m. on a Tuesday, near the intersection of two busy streets in South Los Angeles. Consequently, many people saw the shooting. Two eye witnesses, Reyna Hart and Barbara Lee, described one of the shooters as having a long, unruly afro, that looked as if it had been braided but the braids had been taken out. Luis Ontiveros told police the shooter had very short hair. None of the witnesses described the shooter as having facial hair.

Ms. Hart was pumping gas at a station located across the street from the bus stop where the shooting took place. As she filled up her car, Hart looked out toward the bus stop. She saw a man wearing a gray "hoodie" sweatshirt pull a gun and shoot at another person who was waiting for the bus. Hart dropped to the ground and heard two or three more shots. After a few seconds, she stood up and saw the shooter fire another shot. He then ran south, down Western Avenue. As he ran, the hood fell back, revealing his long afro. The day after the shooting, police showed Hart a six photograph line up, with appellant's photograph appearing in position number four. Hart told the officers she was about 80 percent certain the person in photograph number two was the suspect. She stated it was "definitely not" any of the others. At both the preliminary hearing and trial, Hart identified appellant as the shooter.

Barbara Lee was waiting at a bus stop across the street from the site of the shooting. Two teen aged males were standing nearby. Lee looked them up and down, because she thought they shouldn't be going to school looking the way they did. One of the young men wore sneakers with a black and white print, and a hoodie sweatshirt. His hair looked like it had recently been unbraided. After several minutes, the two young men ran across the street to the opposite bus stop. Lee heard three shots fired. Then, she saw the "one with the hair" run down Western Avenue while his companion ran up Manchester Avenue.

Later that day, police showed Lee a six photograph line up. She first told the officers that the shooter she saw was not in the lineup. Later, she circled

3

appellant's photograph and wrote, "Photo Number four looks like the person I seen, but the face is too fat." Lee testified that she looked the person in the hoodie straight in the face and the person in photograph number four was not the person she had seen. In court, she recognized appellant as the person from the photograph. She testified that appellant was not the person she had seen at the bus stop. Lee also testified that a pair of sneakers, found during a search of appellant's bedroom, looked like the sneakers worn by the shooter.

Luis Ontiveros was walking across a grocery store parking lot, looking down Manchester Avenue when he saw two males approach a man at the bus stop. Ontiverso heard three gun shots, ducked behind some cars and then heard more shots. After the shooting stopped, Ontiveros looked up to see the two males running from the scene. Within a few minutes, Ontiveros identified Sullivan as one of the males in a field "show up." Five months after the shooting, at the preliminary hearing, Ontiveros identified appellant as the shooter. He described the shooter as having "very short" hair and no facial hair.

Noya Abrego was driving her car, waiting to turn left from Western Avenue to Manchester Avenue when the shooting occurred. Although she did not see the shooting, she heard the shots. When she looked toward the bus stop, Abrego saw one man with a gun in his hand for a second or two. Then, she saw him run southbound on Western Avenue. Abrego also saw Sullivan run east on Manchester, the direction Abrego was traveling. Abrego followed Sullivan and later identified him. She did not identify appellant as one of the people involved in the shooting.

Dr. Kathy Pezdek, an experimental psychologist and professor of cognitive science at Claremont Graduate University testified as an expert witness for the defense. Her testimony described for the jury the current scientific understanding of the way human brains create and store memories and the multiple factors that affect the accuracy of an eye witness identification. Pezdek testified that her own research, and studies conducted by others, had established ten factors that affect the accuracy of an identification: (1) exposure time; (2) distraction; (3) weapon focus; (4) stress; (5)

4

disguise; (6) cross-racial identifications; (7) time delay between the observation and the attempted identification; (8) suggestive influence from seeing a photograph after the passage of time; (9) suggestive feedback from the police officer or other person asking for the identification; (10) bias created by in-court identifications.

*Jury Instructions*

The trial court instructed the jury with the pattern jury instructions concerning circumstantial evidence. Among other things, it informed the jury: "[B]efore you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence." (CALCRIM No. 224.)

The jury was also instructed, in terms of CALCRIM No. 315, to evaluate eye witness identification testimony using many of the same factors described by Dr. Pezdek. The trial court instructed the jury, in terms of CALCRIM No. 332, on its evaluation of the expert testimony: "Witnesses were allowed to testify as experts and to give opinions. You must consider the opinions, but you are not required to accept them as true or correct. [¶] The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. [¶] An expert witness may be asked a hypothetical questions. A *hypothetical question* asks the witness to assume certain facts are true and to give an opinion based on the assumed facts. It is up to you to decide whether an assumed fact has been proved. If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion. [¶] You may

5

disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

*Discussion*

The trial court did not define expert opinion testimony as circumstantial evidence or specifically instruct the jury to apply CALCRIM No. 224 in its evaluation of the expert testimony. Appellant contends this was error. He contends the trial court was obligated, sua sponte, to instruct the jury that, if the expert witness' opinion supported two reasonable inferences, one leading to guilt and the other to innocence, it was obligated to accept the inference leading to innocence.

As we noted above, appellant did not request this clarifying instruction, or object that the instructions given were incomplete or ambiguous. As a consequence, he has forfeited this claim for purposes of appeal. " 'A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel, and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal. . . .' " (*People v. Whalen* (2013) 56 Cal.4th 1, 81-82, quoting *People v. Lee* (2011) 51 Cal.4th 620, 638.) If appellant "believed the instruction [on expert witness testimony] required elaboration or clarification, he was obliged to request such elaboration or clarification in the trial court." (*People v. Lee, supra,* 51 Cal.4th at p. 638.)

Appellant urges us to reach the merits of his claim because the forfeiture rule does not apply to a pure question of law, such as the question of whether expert opinion testimony should be evaluated using the same rules and preferences applicable to circumstantial evidence. (*In re Sheena K.* (2007) 40 Cal.4th 875, 884.) The "pure question of law" presented here, however, is not whether expert testimony is circumstantial evidence or even whether a jury instruction to that effect would have been a correct statement of the law. The question is whether the trial court had a duty to give that instruction on its own motion, without a request from the defense. We answer that question in the negative.

A trial court has a duty to instruct the jury, sua sponte, " ' "on general principles which are closely and openly connected with the facts before the court." ' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 823.)  This includes a duty to instruct the jury on the defense theory of the case and on any affirmative defenses that are relied upon by the defendant, or that are supported by substantial evidence and are not inconsistent with the defense theory of the case.  (*People v. San Nicolas* (2004) 34 Cal.4th 614, 669.)  There is no similar duty to provide the jury with "pinpoint" instructions.  A pinpoint instruction does not involve a general principle of law, but instead describes specific evidence that could negate or rebut the prosecution's proof of an element of the offense.  (*People v. Anderson* (2011) 51 Cal.4th 989, 996.)  "Such instructions relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case, such as mistaken identification or alibi.  [Citation.]  They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte."  (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.)

The instruction for which appellant now advocates is a "pinpoint" instruction because it relates specific evidence – Dr. Pezdek's opinion testimony – to an element of the offense – appellant's identity as the shooter.  Our Supreme Court has consistently held that such instructions " 'are not required to be given *sua sponte* and must be given only upon request.' "  (*People v. Anderson, supra*, 51 Cal.4th at pp. 996-997, quoting *People v. Saille, supra*, 54 Cal.3d at p. 1117.)

Appellant next contends counsel's failure to request instructions concerning circumstantial evidence and expert testimony amounted to ineffective assistance of counsel.  We disagree.  To prevail on a claim of ineffective assistance of counsel, appellant must demonstrate that the representation he received from trial counsel fell below an objective standard of reasonableness, according to prevailing professional norms, and that there is a reasonable probability the result of the trial would have been different but for counsel's unprofessional errors.  (*Strickland v.*

*Washington* (1984) 466 U.S. 668, 687-688; *People v. Farnam* (2002) 28 Cal.4th 107, 148.)

Appellant has failed to demonstrate that he was prejudiced by trial counsel's decision not to request the omitted instruction because there is no reasonable probability appellant would have obtained a more favorable result had the instruction been given. Dr. Pezdek described psychological factors that have been shown to impact the reliability or accuracy of an eyewitness identification. She was not permitted to opine on the accuracy or reliability of any particular witness' identification, nor did she testify that identifications made under particular circumstances (e.g., a one-person, in field "show up," or an in-court identification) are always inaccurate or unreliable. Instead, her testimony informed the jury that identifications made under certain circumstances are more likely to be unreliable or inaccurate than identifications made under other circumstances. The inferences that may reasonably be drawn from Dr. Pezdek's testimony might support, but do not require, the jury's rejection of any eyewitness identification.

Here, the eyewitness identifications were corroborated in many ways. Most importantly, Sullivan identified appellant as his accomplice. At the time of his arrest, Sullivan was carrying a cell phone that he had used to call appellant four times within 10 minutes of the shooting. Appellant's cell phone received those calls through a tower located three blocks south of the murder scene. Shoes matching the description given by Barbara Lee were found in appellant's bedroom. Both Hart and Lee described the shooter's distinctive hairstyle. Appellant's step-father testified that appellant's hair matched that description on the morning of the shooting. Given this extensive corroboration of the eyewitness identifications, we can see no reasonable probability that an instruction directing the jury to treat Dr. Pezdek's testimony as circumstantial evidence would have produced a verdict more favorable to appellant.

*Conclusion*

The trial court was not obligated to instruct the jury, sua sponte, to apply instructions governing its consideration of circumstantial evidence to its consideration

8

of expert witness testimony.  Because appellant did not request that instruction, he has forfeited the claim of error for purposes of appeal.

The judgment is affirmed.

NOT TO BE PUBLISHED.


YEGAN, J.


We concur:


GILBERT, P.J.


PERREN, J.

Henry J. Hall, Judge

Superior Court County of Los Angeles

_____

Donald R. Tickle, under appointment by the Court of Appeal, for Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson, Supervising Attorney General, Michael Katz, Deputy Attorney General, for Respondent.